IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 4:13-CR-00019 |
| | ) | |
| JAMES MARION SLATE | ) | |

## AGREED STATEMENT OF FACTS

### Introduction

In late 2012, and continuing into the early months of 2013, there was a political debate nationally about the possibility of banning certain types of "assault style" firearms. One of the collateral consequences of that debate was that demand for and the prices of this type of firearm spiked. Assault style firearms were selling on the secondary market for hundreds of dollars more than their original retail price. During the same time period S&W was preparing to and did introduce a new assault style firearm described as a S&W M&P10 .308 caliber rifle (hereinafter "M&P10 rifle"). That firearm was only going to be available nationally through six of their distributors. Additionally, the M&P10 rifles would only be sold to active military, military spouses and first responders (police, fire and rescue). These firearms were to go on sale February 1, 2013, at Town Gun Inc., d/b/a Town Police Supply ( hereinafter "Town Gun"), an FFL located in Collinsville, Virginia. FFLs are required by law to keep and maintain certain records. Those required record include an "Acquisitions and Dispositions book" (hereinafter "A&D book") and completed forms 4473for every firearm sale to a private party.

### The Facts of the Case

The facts of this case would include the following. David Haskins own and operates Southern Gun and Pawn, Inc., (hereinafter "Southern Gun") together with A-1 Used Cars, on Route 220 in Collinsville, Virginia. He is an FFL and has been since 2007. In late December 2012, Haskins contacted Town Gun an asked if he could buy multiple Bushmaster M-4 MOE .556 caliber rifles for Southern Gun. This is an assault style rifle. Town Gun advised it was unwilling to do so. However, Town Gun would sell Haskins one Bushmaster in his individual capacity. On December 28, 2012, Haskin did purchase a Bushmaster firearm and put it in the inventory of Southern Gun. The next day, on December 29, 2012, Haskins directed two of his

employees, his daughter Erin Haskins and Brett Mouyios each to go to Town Gun and purchase identical Bushmaster rifles firearms for him. In the case of Brett Mouyios, Haskins provided the buy money for the firearm. Both, Brett Mouyios and Erin Haskins, filled out ATF form 4473 and purchased Bushmaster firearms from Town Gun for Haskins at Haskins direction. Both Brett Haskins and Erin Haskins falsely answered question 11a when they answered that they were the true purchaser, when in fact they were acquiring the firearm on behalf of Haskins. It should be noted that question 11a of the form 4473 contains the following warning in bold print: **"Warning you are not the actual buyer if you are acquiring the firearm on behalf on another person".** These transactions are the factual basis for counts 1-4 of the superseding indictment.

On February 1, 2013, James Slate was advised by a co-worker that Town Gun had a good price on the new M&P10 rifle. Slate understood that law enforcement officers could buy up to two rifles and two S&W M&P handguns (either 9mm or .45 caliber) at a discounted price. During the events of the day, Slate spoke to Erin Haskins by phone about the deal at Town Gun. Slate is engaged to Erin Haskins and lives with her. David Haskins voiced an interest in purchasing these firearms from Slate, if Slate purchased any and was interested in selling them. On February 1, 2013, Slate purchased two M&P10 rifles and two M&P 9mm pistols from Town Gun and took them to Southern Gun. Ultimately, all four of those guns were sold to Haskins by Slate. This transaction is not the subject of any charges. It should be noted during this transaction that Slate answered question 11a on form 4473 and he also signed the form certifying that he read and understood the notices, instructions and definitions and further that he understood it to be a federal felony to falsely answer question 11a.

At some time in early February, David Haskins directly, and through his daughter and employee Erin Haskins, asked James Slate if he would recruit other law enforcement officers to purchase M&P10 rifles and other firearms for David Haskins. James Slate stated that he would attempt to recruit other officers to purchase firearms for David Haskins. James Slate was good to his word and tried to recruit at least three other law enforcement officers. One was Rocky Mount Town Officer Christopher Shelton. Shelton has indicated during two interviews that he was approached by James Slate who asked Shelton to purchase guns at Town Gun for Haskins and be paid a $200 fee or profit. Shelton thought what was being proposed may be illegal. Shelton never made or attempted to make any firearm purchases under this proposal. The second officer was Ryan King of the Rocky Mount Police Department. King indicated during two interviews that he was approached by James Slate who asked if King wanted to "make a quick couple of hundred dollars". Slate told King that Haskins would supply the buy money for the firearms and that King would be paid $50 per gun for a total of $200. Slate advised King on exactly which firearms Haskins wanted by make and model. King contacted Town Gun to see if the S&W M&P10 rifles and the S&W M&P pistol were available. King then concluded something did not feel right and told Slate he could not do the deal because he could not find his

voter ID. The third person recruited by Slate to purchase the S&W M&P rifles and pistols was Lewis Carroll. Lewis Carroll indicated during two interviews that he is a Patrick County deputy.

He stated that he is good friends with Slate and that he and Slate rode together every day from Patrick County to Martinsville for 24 weeks while they attended the police academy. Carroll indicated that he was approached by Slate about buying rifles and pistols for Haskins. Slate told Carroll that he would be paid $100 per firearm for obtaining the firearms. Slate told Carroll that Haskins was trying to get a lot of firearms following the school shooting. Carroll indicated he thought something did not feel right about the deal. Carroll discussed the situation with his sheriff and was told by his sheriff not to do any deal like that because it would be a straw purchase. Carroll told investigators that Carroll then advised Slate what the sheriff had told him. Slate's initial conversation with Carroll, recruiting Carroll to purchase firearms for Haskins, was witnessed by Erin Haskins according to Erin Haskins interview. Slate readily admitted recruiting Shelton and King to buy guns for David Haskins. However, Slate never identified Carroll even though he was asked repeatedly about if he had recruited anyone else.

David Haskins also asked his employee Ursula Kiser-McHeimer to recruit military personnel to buy guns for David Haskins. Ursula was interviewed and also gave sworn testimony before the grand jury. Ursula testified that David Haskins asked her if she knew anybody who could buy the S&W M&P rifles that were new on the market and available only to military and law enforcement. Ursula knew that David Haskins was not qualified to purchase them from Town Gun. Ursula was aware that David Haskins was sending law enforcement officers into Town Gun to buy these firearms for David Haskins and that Haskins was paying these officers to make these firearm purchases. Ursula recruited her brother James Kiser and his wife Britney Kiser to buy these firearms for David Haskins. Ursula was aware that Britney Kiser made at least three firearms purchases for Haskins and that Britney Kiser was given a written list of exactly what to purchase. Ursula was also aware that James Kiser made a purchase of firearms for David Haskins. Ursula also recruited James Maish to purchase these firearms for David Haskins and that Maish did make a firearms purchase. Ursula indicated that she received no compensation or other consideration for her efforts.

Britney Kiser was interviewed and gave sworn testimony before the grand jury. Britney Kiser stated that she was first contacted by her sister-in-law, Ursula Kiser-McHeimer, about talking to David Haskins. Britney Kiser met with David Haskins who asked her to purchase guns for him that were not available to the public. Britney Kiser was qualified to purchases because she was the military spouse of James Kiser who is in the military and she had military identification. Britney Kiser agreed to make these purchases and in fact made purchases on four occasions totaling 12 firearms. The dates of those transactions were February 7, 9, 11 and 11, 2013. On each of the four purchases Haskins provided Britney Kiser with the purchase money and paid her a fee for buying the guns upon her return. As a part of the first purchase, David

Haskins provided Britney Kiser a written list including the firearms to be purchased and the price to be paid. After making the purchases, Britney Kiser would go directly to Southern Gun and deliver the firearms she had purchased at David Haskins direction. On the first and second transaction, Britney Kiser purchased two S&W M&P10 .308 caliber rifles and two S&W M&P 9mm pistols. On the third purchase, Britney Kiser intended to do the same but Town Gun would not sell her the S&W firearms. Town Gun did offer to sell her a Rock River Arms LAR-8 .308 caliber rifle. This firearm is also an assault style rifle. Britney Kiser phoned David Haskins and advised him of the situation. Haskins directed Britney Kiser to purchase the Rock River rifle and she did as instructed. On the fourth and final purchase, Britney Kiser also intended to purchase four S&W firearms. However, Town Gun only had one S&W M&P 9mm pistol so she purchased two S&W M&P10 .308 rifles and a single S&W M&P 9mm pistol. Each of these transactions is confirmed by the forms 4473 and other supporting documentation kept by Town Gun and by the A&D book kept by Southern Gun. It was a part of each of these four transactions that Britney Kiser answered question 11a falsely as she was not the actual purchaser of the firearms. These four straw purchases are what are charged in counts five, six, nine, ten, thirteen and fourteen of the superseding indictment. Britney Kiser stated that she does not like guns does not own any guns and has never purchased a firearm on her own.

James Kiser was interviewed and gave sworn testimony before the grand jury. James Kiser stated that after being contacted by his sister, Ursula Kiser-McHeimer, he met with David Haskins about buying S&W firearms from Town Gun for David Haskins. James Kiser made a purchase on February 8, 2013. On that occasion, James Kiser went to Southern Gun and got a written list of what he was to buy and what the prices would be. It called for James Kiser to buy two S&W M&P10 .308 caliber rifles and two S&W M&P 9mm pistols. James Kiser was also provided with the buy money by David Haskins. Following the purchase at Town Gun, James Kiser delivered the four firearms to Southern Guns where he was paid $100 for buying the firearms. This transaction is confirmed by the form 4473 and other supporting documents kept by Town Gun and the A&D book kept by Southern Gun. It was part of this transaction that James Kiser answered question 11a of form 4473 falsely as he was not the actual purchaser of the firearms. This straw purchase what is charged in counts seven and eight of the superseding indictment.

James Maish was interviewed and gave sworn testimony before the grand jury. James Maish stated that he was contacted by Ursula Kiser-McHeimer to buy guns for her boss David Haskins. Ursula explained that Town Gun was selling S&W rifles to military and law enforcement only and that David Haskins wanted him to purchase these firearms and would be paid $300. James Maish agreed. On February 13, 2013 James Maish was told that Haskin wanted him to purchase two M&P 10 rifles and two S&W M&P 9mm pistols. Maish went to Town Gun made the purchase as directed and delivered four firearms directly to Southern Gun where met with David Haskins. David Haskins asked Maish if he would be willing to do another

transaction and purchase four more guns for him that day. Maish agreed and went back to Town Gun to do a second transaction for two more M&P10 rifles and two more 9mm pistols. While at Town Gun, James Maish learned that Town Gun was out of 9mm pistols but did have S&W M&P .45 caliber pistols. James Maish inquired of David Haskins what to do and David Haskins instructed Maish to buy the .45 caliber pistols. James Maish purchased the four firearms as instructed and delivered them directly to David Haskins at Southern Gun. These two transactions are confirmed by the forms 4473 and other supporting documents kept by Town Gun and by the A & D book kept by Southern Gun. It was a part of this transaction that James Maish answered question11a falsely as he was not the actual purchaser of the firearms. These straw purchases are charged in counts fifteen-eighteen of the superseding indictment.

Jerrold Carter was interviewed and gave sworn testimony before the grand jury. Jerrold Carter stated that he is a sergeant in the army national guard. Carter was contacted my James Maish to see if Carter would be interested in buying assault rifles for David Haskins from Town Gun and that he would be paid $300 for purchasing four firearms. Carter agreed. Carter then met David Haskins at a Walgreens parking lot in Collinsville where Haskins told Carter exactly what to buy, namely two S&W M&P10 .308 caliber rifles and two S&W M&P 9mm pistols. Carter was also given cash by David Haskins to cover the cost of the purchase. Carter went to Town Gun to make the purchase but learned there were no 9mm pistols but there were .45 caliber pistols available. Carter contacted Haskins who instructed Carter to purchase the .45s. During the transaction a background check was run and it came back as a hold. It was a part of this uncompleted transaction that Jerrold Carter answered question 11a of form 4473 falsely as he was not the actual purchaser of the firearms. Carter left Town Gun and went directly back to Southern Gun where Carter advised Haskins of the situation and returned the purchase money to David Haskins.

Deputy Thomas Frye of the Henry County Sheriff's Office purchased an M&P10 rifle and listed it for auction on GunBroker.com. The winning bid went to David Haskins. When Haskins spoke to Frye by phone, about arranging for the delivery, David Haskins solicited Frye to buy more of the M&P 10 rifles for Haskins. When Frye went to Southern Gun on February 8, 2013, to deliver the firearm to David Haskins, Frye was equipped with an audio-video recorder. During that transaction Haskins again solicited Frye to buy firearms for Haskins and explained how Frye would make money doing it. Haskins also stated he had other individuals buying firearms for him.

On February 15, 2013, Deputy Frye, operating in an undercover capacity went to Town Gun and purchased two M&P10 rifles and two S&W M&P 9mm pistols. Frey then made two separate deliveries to Southern Gun. During each of the deliveries, Frye delivered one rifle and one pistol and was paid for the firearms and was also paid a fee.

Following the deliveries of the firearms by Deputy Frye on February 15, 2013, ATF agents executed a federal search warrant at Southern Gun. Among the items seized were twenty-one firearms and Southern Gun's A&D book. At that time, David Haskins was advised of his Miranda rights and was interviewed at his place of business. David Haskins acknowledged each of the transactions in question. Haskins confirmed sending Brett Mouyios and Erin Haskins to buy Bushmaster assault rifles from Town Gun for him on December 29, 2012. Haskins acknowledged providing them with the purchase money. Haskins admitted sending Britney Kiser to buy a total of 12 firearms for him on four separate occasions. Haskins admitted he told her what to buy and provided her with the purchase money. Haskins paid her a fee of each transaction. Haskins admitted that he sent James Kiser to purchase two M&P10 rifles for him on February 8, 2013, and that Haskins provided the purchase money. James Kiser was paid a fee for making the purchase for Haskins. Haskins also admitted sending Maish to purchase a total of eight firearms at Town Gun for Haskins as a part of two transactions on February 13, 2013. Maish was paid a fee for making those purchases.

Also, on February 15, 2013, James Slate was interviewed by ATF Special Agent William Cunningham at Slate's place of employment at the town of Rocky Mount Police Department. Much of that interview dealt with the particulars of Slate's purchase of two S&W M&P10 .308 rifles and two S&W M&P 9mm pistols from Town Gun on February 1, 2013; and his subsequent sale of those firearms to David Haskins. Slate gave multiple differing accounts of that transaction and was unable to offer any explanation for the inconsistences and discrepancies. Slate also stated that he was asked repeatedly by David Haskins to find other officers who would buy firearms for Haskins. Slate agreed to try to recruit buyers and told the investigator that he asked both Christopher Shelton and Ryan King of the Rocky Mount Police Department. (It should be noted that Slate failed to the mention the first person he reached out to recruit, his close friend Lewis Carroll of the Patrick County Sheriff's Department).

This scheme to systematically purchase assault style weapons and handguns resulted in a total of twenty four firearms being the subject of straw purchases. Of those twenty-four, sixteen were seized in the search of Southern Gun on February 15, 2013, and are the subject of the asset forfeiture. The other firearms that were not recovered are documented in Southern Gun's A&D book as having been sold. It must be noted that a total of twenty-one firearms are listed in the government's notice of forfeiture. As previously stated, sixteen of the firearms are the subject of straw purchases. Four of the firearms were the subject of the undercover controlled "straw purchase" by Deputy Thomas Frye on February 15, 2013, and subject to forfeiture. As to the final firearm, S&W M&P10 .308 KNO2117, it has been determined, following further investigation, that it was not the subject of a straw purchase but was purchased legally. As a result that firearm will be returned to the inventory of Southern Gun in accordance with the terms of the plea agreement.

I have read the foregoing statement of facts, I agree that it is an accurate account of the events surrounding the charge to which I am pleading guilty to under the terms of my plea agreement.

_____  2/18/14
James Marion Slate, Defendant      Date

_____  2-18-14
Christopher K. Kowalczuk, Esquire  Date
Counsel for Defendant

_____  2-19-2014
Donald R. Wolthuis                 Date
Assistant United States Attorney